W. G. BRENNAN et al., Appellants,

v.

C. M. CARTER, Sr., et al., Appellees.

Court of Appeals of Kentucky.

Dec. 14, 1956.

Duncan & Huddleston, Bowling Green, for appellants.

Noel F. Harper, Frank Goad, Scottsville, for appellees.

MILLIKEN, Chief Justice.

Appellants, W. G. Brennan and A. R. Umland, seek reversal of a judgment of the Allen Circuit Court decreeing forfeiture of their right to possession of three oil and gas leases under an operation and option to purchase contract. We shall refer to the appellants henceforth as the operators and the appellees as the lessors.

A few months prior to the execution of the contract, the lessors, C. M. Carter, Sr., J. C. Carter, Glen Britt, J. H. Collins and Fred J. Hale, all businessmen of Scottsville, Allen County, had acquired in the county three abandoned oil leases known as the Lloyd, Carter and Frost leases. There were several wells on the leases, and in September, 1954, when the leases became the subject of the contract in question, the lessors had attempted to clean out four of the wells, installed a gasoline pump and were attempting in a crude way to produce oil.

Under the terms of the contract, the lessors delivered possession of the leases to the operators, who called themselves oil promoters, and the latter agreed to "take over management of these leases * * *

to place thereon power vacuum equipment, storage tanks wherever (sic) needed, receiving tanks, lines, sucker rods and any and all equipment incident to the production of crude oil." The operators were to take over supervision of the four wells already in operation and to continue daily to "pump" them. They were to drill two additional wells, the first to be commenced in 90 days and the second in 6 months after the execution of the contract. The operators were to produce and market oil and pay lessors one-fourth of the gross amounts received from the sale of the oil, and these royalty payments were to be credited to the $12,000 agreed purchase price of the leases. The contract authorized the operators to negotiate sales of fractional parts of the total leasehold property, and the lessors agreed to release each one-eighth part of their interest up to one-half upon payment to them of $1,250, or a total of $5,000 for the one-half interest. The operators were authorized to negotiate sales of the remaining one-half interest at $3,500 per quarter interest, or a total of $7,000, which, less accrued royalty payments, was to be remitted to lessors. The title to the leasehold property was to remain in the lessors to be released by them upon receipt of payment for each fractional part, or until the purchase price was paid off in royalties. The contract did not fix any time limit within which the purchase price had to be paid in full. No sales of fractional interests were ever consummated.

The lessors' complaint seeking forfeiture was filed April 29, 1955, approximately seven months after execution of the contract. At the trial the lessors testified that during the effective period of the contract they had received altogether only $126.24 in royalty payments. The forfeiture provision provided:

"If second parties (the operators) fail or refuse to continue operations regularly as provided herein for a period of thirty (30) days this option will become null, void and of no effect."

The operators took possession of the leases and began improvements by making electric power available to the four old wells and equipping them with vacuums and electric pumps. The two additional wells were drilled within the periods specified in the contract, both wells being producers. Operator W. G. Brennan testified that they had spent between $8,000 and $10,000 on operating the leases. The contract provided that all improvements added to the leases were to become "a part of the permanent property and a part of the collateral security to the indebtedness held against the property by parties of the first part (the lessors)." The trial court judgment permanently enjoined the operators from removing any of the improvements from the property and canceled the lease.

The testimony of the lessors was to the effect that the well on the Carter property had not been operated for at least three months and that on the Lloyd property for at least two months, and that a well on the Frost property had not been operating most of the time. It appears that the pumping equipment used was not adequate, with a consequent loss of oil to adjoining operators who were using adequate equipment, and that the operators' inadequate equipment was not working throughout the day so as to get the best results. There was opinion evidence of experienced oilmen to the effect that these leased properties were not being operated with normal effectiveness.

The operators conceded that only one tank of oil was sold the first three months but expected, with the installation of electrical equipment, to raise the production to as high as three tanks a month. The evidence suggests that perhaps much of the operators' difficulty in effecting normal production was caused by lack of money.

There was no obligation on the part of the operators to buy the leases and no express obligation on the part of the lessors to sell them. It was evidently understood by the parties that lessors were to be paid from the sale of fractional interests in these leases. By developing the leases and making them more readily salable, the operators expected to realize some profit on the sale of each fractional interest. The testimony indicates the parties did not contemplate the entire "agreed purchase price" would be amortized through royalty payments.

The trial court expressed the view that "if the processes and actions of the appellants (operators) are continued in the future as in the past, the value of appellees' (lessors') leases will be substantially diminished, if not destroyed." And it pointed out that in oil cases courts are not hesitant to apply forfeiture where expressly provided for, because the oil, being fugitive in nature, must be entrapped while under a particular tract of land, otherwise it may be lost. Therefore, the time within which exploration and development must be done is considered the essence of the contract. Bell v. Kilburn, 192 Ky. 809, 234 S.W. 730.

It is usually a question in actions to forfeit such as this whether the promoter, the lessee or operator, has been at heavy expense in his efforts to develop the leased premises. Where such is the case, and he has shown reasonable diligence, the court will not enforce a forfeiture as readily as where he had made no effort, or his actions were not bona fide. But, nevertheless, diligence will not always excuse a failure to develop the land within the time specified where the lessor's property is only barely more productive than if the promoter had not attempted to develop it. Thornton, Oil and Gas, Fifth Edition, Sec. 319.

We concur with the conclusions of the trial court, for we do not find them clearly erroneous. CR 52.01.

The judgment is affirmed.